# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

**UMB BANK, N.A., as Trustee,**
                    **Petitioner and Plaintiff**

**v.**

**CITY OF CENTRAL FALLS; JAMES A. DIOSSA, MAYOR OF THE CITY OF CENTRAL FALLS; MARIA RIVERA, CITY COUNCILOR; JONATHAN ACOSTA, CITY COUNCILOR; HUGO FIGUEROA, CITY COUNCILOR; FRANKLIN SOLANO, CITY COUNCILOR; JESSICA VEGA, CITY COUNCILOR; CENTRAL FALLS DETENTION FACILITY CORPORATION, WILDER ARBODELDA, CORPORATION DIRECTOR; GARY BERDUGO, CORPORATION DIRECTOR; JOSEPH MOLINA FLYNN, CORPORATION DIRECTOR; and HERMAN YIP, CORPORATION DIRECTOR.**
                    **Respondent and Defendants**

**APPOINTMENT OF RECEIVER AND TEMPORARY RESTRAINING ORDER REQUESTED**

## <u>VERIFIED PETITION FOR APPOINTMENT OF RECEIVER AND COMPLAINT</u>

### INTRODUCTION

UMB Bank, N.A., as successor indenture trustee for those certain Detention Facility Revenue Refunding Bonds described more fully below (the "<u>Trustee</u>"), files this petition for the immediate appointment of a receiver (the "<u>Receivership Petition</u>") and the grant of a temporary restraining order to protect against the immediate and irreparable harm to the assets of the Central Falls Detention Facility Corporation (the "<u>Corporation</u>"), and complaint against the Corporation, City of Central Falls (the "<u>City</u>"), Mayor James A. Diossa (the "<u>Mayor</u>"), City Councilors Jonathan Acosta, Hugo Figueroa, Jessica Vega and Franklin Solano (collectively, the "<u>City Council</u>"), Corporation Directors Wilder Arborelda, Gary Berdugo, Joseph Molina Flynn, and Herman Yip

(collectively, the "Board of Directors") for violations of statutory law, common law, and contract, and for declaratory relief. The damages caused by the Defendants' actions exceed $130 million, plus all costs of collection, including attorney's fees.

The Trustee represents the holders of the Bonds owed well over $130 million. The bond debt represents approximately 99% in dollar amount of the Corporation's liabilities (based on the Corporation's financial statements). As the senior secured creditor to the Corporation, the Trustee holds first priority liens against all of the Corporation's assets, including its revenue, accounts, and real property. However, the value of the Collateral (defined herein) is less than the amount owed on the Bonds (defined herein) and the Trustee has no recourse under the Bond Documents (defined herein) against either the City or the State to make itself whole. The Trustee files this Receivership Petition to protect against the harm caused by the City, Mayor, City Council, and Board of Directors over the past two weeks seeking to close the Donald F. Wyatt Detention Facility (the "Wyatt"), which would result in the immediate and significant waste of the Trustee's Collateral and potentially lead to life safety issues if the USMS and ICE were forced to immediately relocate nearly 600 detainees to unknown locations.

The Trustee does not seek to liquidate the Corporation and there is no claim of mismanagement of the Corporation or its business by its Warden (defined herein). The Trustee has no objection to current day-to-day management under the Warden's direction or his ability to maintain the Corporation's operations in accordance with its significant obligations to the United States Marshals Service ("USMS") and the U.S. Immigration and Customs Enforcement ("ICE"). However, a temporary restraining order and receiver is necessary to protect against the waste of Collateral due to the ongoing and unlawful actions taken by the City, by and through its Mayor and City Council, and the Board of Directors to damage the Corporation, interfere with its federal

contracts and impair the Trustee's rights under the Bond Documents, including the Trustee's security for repayment of the Bonds. The Indenture expressly grants the Trustee, in the event of default, the right to file an action "to enjoin any act" which may be unlawful or in violation of the rights of the Owners of the Bonds". Indenture, § 11.2(a)(iv)

A temporary restraining order is necessary to maintain the status quo and prevent the immediate and irreparable injury that would result from the Board of Directors' action to suspend the ICE Addendum (defined herein) to the USMS Contract (defined herein) for a period of 90 days and to seek removal of all ICE detainees from the Wyatt. Further, the appointment of a receiver would support the Warden's day-to-day management and enable the Corporation to maintain its legally mandated independence from the City and State. As an officer of the Court, a receiver would be independent of the political whims of the City, ensure that the Corporation remains in operation, preserve 211 Rhode Island jobs (over 150 of which are union positions), and take action to support the Corporation's performance of its obligations to its creditors.

## JURISDICTION

1.      This Court has jurisdiction over this Verified Petition for Appointment of Receiver and Complaint under 28 U.S.C. § 1332(a) and 28 U.S.C. § 1331.

2.      There is diversity of citizenship amongst the parties and the amount of the matter in controversy exceeds the sum of $75,000.

3.      The Complaint raises a federal question concerning the enforceability of the Board of Directors' vote to suspend the ICE Addendum to the USMS Contract, which is a contract with the federal government that is governed by federal law. The USM Contract is governed by, among others, Department of Justice Appropriation Act for 2001 (Public Law 106-553).

**VENUE**

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

**PARTIES**

5.      Plaintiff, UMB Bank, N.A., is a national banking association, with its main office located in Kansas City, Missouri, as set forth in its articles of association.  UMB Bank, N.A. is the successor trustee under the Indenture and has due authority under the Bond Documents to bring actions to enforce the rights granted thereunder.

6.      Defendant, the City of Central Falls is a duly incorporated municipality within the State of Rhode Island, and pursuant to R.I. Gen. Laws § 45-15-2, with its principal place of business located at 580 Broad Street, Central Falls, Rhode Island 02863.

7.      Defendant, Central Falls Detention Facility Corporation is a public corporation, which is an instrumentality and agency of the municipality set out in R.I. Gen. Laws § 45-54-1, et seq.

8.      Defendant, James A. Diossa is a natural person and is the elected Mayor of the City of Central Falls, Rhode Island, residing at 315 Central Street, Central Falls, Rhode Island 02863.

9.      Defendant, Maria Rivera, is a natural person and a member of the City Council for the City of Central Falls, Rhode Island, residing at 324 Hunt Street, Central Falls, Rhode Island 02863.

10.     Defendant, Jonathan Acosta, is a natural person and a member of the City Council for the City of Central Falls, Rhode Island, residing at 100 Illinois Street, Central Falls, Rhode Island 02863.

11.     Defendant, Jessica Vega, is a natural person and a member of the City Council for the City of Central Falls, Rhode Island, residing at 54 Parker Street, Central Falls, Rhode Island

02863.

12.     Defendant, Wilder Arbodelda, is a natural person and a member of the Board of Directors of the Corporation, residing at 197 Bucklin Street, 1st Floor, Pawtucket, Rhode Island 02861.

13.     Defendant, Gary Berdugo, is a natural person and a member of the Board of Directors of the Corporation, residing at 146 Central Street, Central Falls, Rhode Island 02863.

14.     Defendant, Joseph Molina Flynn, is a natural person and a member of the Board of Directors of the Corporation, residing at 127 Dorrance Street, 4th Floor, Providence, Rhode Island 02903.

15.     Defendant, Herman Yip, is a natural person and a member of the Board of Directors of the Corporation, residing at 501 Roosevelt Avenue, Unit R03, Central Falls, Rhode Island 02863.

## FACTS

**A.     The Corporation.**

16.     In 1991, the Rhode Island legislature enacted R.I. Gen. Laws § 45-54-1 et seq. (the "Detention Center Act"), which "incorporated in each city and town a body corporate and politic which shall be known as the municipal detention facility corporation of the municipality."

17.     In accordance with Rhode Island statute, "the corporation is a public corporation, which is an instrumentality and agency of the municipality, ***but has a distinct legal existence from the municipality***, and which has purposes that are consistent with the declaration of purpose set out in this chapter, and which has powers that are necessary and incidental to the effectuation of the stated purposes."  R.I. Gen. Laws § 45-54-1.

18.     On August 5, 1991, the City Council voted to "support passage of an Act creating

Municipal Detention Facility Corporation and direct[ed] its legislative delegation to support its passage."  A true and accurate copy of the August 5, 1991 Resolution stating the City's support to create the Corporation is attached hereto as **Exhibit A**.

19.     Also on August 5, 1991, the City Council for the City of Central Falls (the "<u>City Council</u>") voted to "declare that there is a need for the Central Falls Detention Facility Corporation to function in the City of Central Falls."  A true and accurate copy of the August 5, 1991 Resolution stating municipal need is attached hereto as **Exhibit B**.

20.     The Detention Center Act expressly provides that "the corporation is exclusively deemed to be established and authorized to transact business and exercise its powers upon proof of the adoption of a resolution by the city or town council declaring the need for the corporation to function."  R.I. Gen. Laws § 54-45-4.

21.     There is no provision under Rhode Island law that authorizes the City to rescind the resolution by which it declared a need for the Corporation.

22.     The Corporation has full power to operate a detention center, with one of its primary missions to "provide for the care, custody, control and transportation of all detainees or inmates committed to detention or incarceration at any project and to take all necessary steps to maintain security, safety and order" of federal detainees.   R.I. Gen. Laws § 45-54-6.

23.     The Corporation is governed by a Board of Directors that is independent of the City.  The Detention Center Act provides that the City's relationship to the Corporation is limited to the Mayor's appointment of persons to serve on the Board of Directors and approval by the City Council.  The Detention Center Act provides that the Mayor, as the chief executive officer, appoints five directors to the Corporation "at least three (3) of whom shall be resident electors" of

the City of Central Falls. Directors Gary Berdugo, Agostinho Silva, and Herman Yip have identified their home address as within the City.

24. Each member of the Board of Directors "before entering upon his or her other duties will take an oath to support the constitution and laws of the state and the constitution of the United States and to faithfully and impartially discharge the duties of his or her office." R.I. Gen. Laws § 45-54-5(c).

25. The day-to-day management of the Wyatt is conducted at the direction of Warden Daniel Martin (the "Warden"). The Warden is assisted by a staff of approximately 210 senior management and correctional officers. Over 150 employees at the Wyatt are union members and subject to collective bargaining with the Corporation. The Warden is authorized to negotiate and execute governmental contracts as authorized by the Board.

26. On or about November 23, 1993, the Corporation commenced operation of the Wyatt.

27. Around June 2004, the Wyatt expanded within its existing structure to a 370 bed facility, primarily to accommodate up to 135 ICE detainees. The City was fully aware of the expansion to a 370 bed facility, which expansion complied with all zoning and regulatory requirements.

28. By 2001, the demand for detainee space by the federal government had increased significantly due, in part, to the destruction of the World Trade Center Towers in New York City and the attack on the Pentagon on September 11, 2001, and the subsequent response of law enforcement to national security matters.

29. In 2005, the Corporation determined it was in its interests to expand the Wyatt to accommodate the increased demand from the federal government for detainee space. To fund its

expansion, the Corporation issued its $106,380,000 Central Falls Detention Facility Corporation Detention Facility Revenue Refunding Bonds (The Donald W. Wyatt Detention Facility) Series 2005A (the "Bonds"), under that certain Indenture of Trust, dated as of June 1, 2005 ("Indenture") by and between US Bank, NA (as predecessor Trustee) and the Corporation. The City was fully aware of the 2005-06 expansion of the Wyatt that was funded by the issuance of the Bonds.

30.     The expansion at the Wyatt opened in December 2006 with a capacity to house approximately 700 detainees.

**B.     The Bond Debt.**

31.     One of the primary powers of the Corporation is to issue bonds and grant mortgages in furtherance of the detention center project.  R.I. Gen. Laws §§ 45-54-6(11) and (12).  Specifically, the Corporation has powers to:

> (12) As security for the payment of the principal and interest on any bonds so issued and any agreements made in connection with that, to mortgage and pledge any or all of its projects, or any part or parts of them, whether then owned or thereafter acquired, to pledge their revenues and receipts or from an interest of the bonds, and to assign or pledge the income received by virtue of the lease or leases . . .

i.     *Indenture.*

32.     The Indenture sets forth the terms and conditions by which the Corporation is obligated to satisfy in full the payment of the Bonds.  A true and accurate copy of the Indenture is attached hereto as **Exhibit C**.

33.     The Corporation covenanted to make regularly scheduled payments of principal and interest on the Bonds.  Indenture, § 3.1. The payments on the Bonds are to be made from the revenues generated by the Corporation from the Wyatt's operations.

34.     The Trustee is the Corporation's senior secured creditor and holds a valid and perfected first priority security interest in, and lien on, substantially all of the Corporation's assets

pursuant to the Bond Documents (defined herein).

35.     The Indenture grants the Trustee a security interest in: (i) all receipts, revenues, income and other money received or receivable by or on behalf of the Corporation derived from the operation or ownership of the Facility and all other sources, and all rights to receive the same; and (ii) the Corporation's other tangible and intangible personal property (the "Indenture Collateral").  Indenture, §§ Granting Clauses, 5.1 and 6.1.

36.     The Indenture Collateral includes all funds established by the Trustee under the Indenture for the benefit of the holders of the Bonds, including a Debt Service Reserve Fund.  At the time the Bonds were issued, $8,829,512.50 was deposited into the Debt Service Reserve Fund as security for payment of the principal and interest on the Bonds.

37.     The Trustee's first priority security interest in the Indenture Collateral is authorized under Rhode Island law, which provides that "no proceeding or notice or approval are required for the issuance of any bonds or any instrument of security for them, except as provided in this chapter."  R.I. Gen. Laws § 45-54-24.  The Trustee additionally perfected its security interest in the Indenture Collateral by filing original UCC-1 financing statements with the Rhode Island Secretary of State.  True and accurate copies of the UCC-1 financing statements identifying all of the Indenture Collateral, and all amendments, continuations and assignments related thereto are attached hereto as **Exhibit D**.

38.     The Indenture provides that upon an Event of Default (as defined in the Indenture), the Trustee may, among several remedies, bring suit upon the Bonds, to "enjoin any acts or things which may be unlawful or in violation of the rights of the Owners of the Bonds" and to enforce "any remedy provided by the Mortgage."  Indenture, § 11.2(a)(iv) and (v).

ii. *Open End Mortgage and Security Agreement*.

39.     As further security for the Corporation's obligations under the Indenture, the Corporation granted a mortgage in favor of the Trustee.  Pursuant to that certain Open-End Mortgage, Deed, Leasehold Mortgage and Security Agreement, dated as of June 30, 2005 (the "Mortgage"; and together with the Indenture and any and all documents relating to the Bonds, including but not limited to the Forbearance Agreement and amendments thereto, the "Bond Documents"), the Corporation granted to the Trustee a first priority security interest in, and lien on: (i) the real property titled in the name of the Corporation, (ii) all revenues of the Corporation, (iii) all personal property of the Corporation, (iv) all leases and rents associated with the Wyatt, and (v) the Corporation's leasehold interest in the real property lease and installment purchase agreement (the "Fink Property"), between Sanford Fink and Francine Fink and the Corporation (collectively, the "Mortgage Collateral"; and together with the Indenture Collateral, the "Collateral").  A true and accurate copy of the Mortgage is attached hereto at **Exhibit E**.

40.     Specifically, the Mortgage Collateral includes "all accounts, chattel paper, instruments, documents and general intangibles . . . [and] all products and proceeds (including insurance and condemnation proceeds) of all the foregoing."  Mortgage, § 1.1(d) and (m).  The USMS Contract (as modified by the ICE Addendum) (each defined herein) is part of the Mortgage Collateral at section 1.1.

41.     The Trustee's first priority security interest in, and lien on,  the Mortgage Collateral is perfected without the need to file any document with the Office of the City Clerk of the City of Central Falls  R.I. Gen. Laws § 45-54-24.  The Trustee additionally perfected its security interest in, and lien on, the Mortgage Collateral by recording the Mortgage on June 29, 2005 at Book 615, page 98 in the Office of the City Clerk.

42.     The Mortgage provides that upon an Event of Default (as defined in the Mortgage), the Trustee may, among several remedies, take possession of and foreclose on the Mortgage Collateral.  Mortgage, § 7.2(a).

43.     The Mortgage further provides the Trustee with a right to have a receiver appointed to take possession of the Mortgage Collateral and stand in the Corporation's shoes.  The Mortgage states that the Trustee, as mortgagee, "shall be entitled to the appointment of a receiver . . . [and the Corporation has] consented to the appointment of such receiver."  Mortgage, § 7.2(c).

*iii.     City's Right to Revenues from the Corporation are Subordinate to the Trustee.*

44.     The Indenture sets forth an express order of priority for use of revenues generated by the Corporation.  Indenture, § 5.6.  All revenues are Collateral and are automatically deposited into the Revenue Fund (as defined in the Indenture) by the various USMS payors.  The Revenue Fund is held by the Trustee.

45.     Pursuant to Indenture section 5.6, the Corporation (at the direction of a Board of Directors selected by the Mayor) consented to and agreed that the first dollars earned by the Corporation would be used to meet the Wyatt's operating expenses.  Indenture, § 5.6(a).

46.     After meeting its budgeted operating expenses, revenues would next be used to fund the debt service on the Bonds.  Indenture, § 5.6(b).

47.     To the extent there are revenues sufficient to pay in full the debt service obligations on the Bonds, revenues would be designated to certain reserve funds as set forth in the Indenture.  Indenture, § 5.6(d), (e) and (f).

48.     Only after satisfying the required principal and interest payments on the Bonds, and making provisions for certain reserve funds, may any excess revenues be paid to the City as Local Impact Fees.  Indenture, §§ 5.6 and 5.14.

49.     In other words, the City has no authority to receive Local Impact Fees until such time as there are excess funds after satisfying the Corporation's operating expenses, debt service on the Bonds and meeting certain reserve requirements.

50.     Since 2009, the Corporation has not had sufficient funds from revenues to make Local Impact Fees to the City.

## C.     **USMS Contract**

51.     In 1993, the Corporation and the USMS entered into an Intergovernmental Service Agreement ("Original IGA"), which was replaced in its entirety in 2018 with that certain "*Detention Services – Operational Agreement – Central Falls Detention Facility Corporation*", dated March 1, 2018 (the "USMS Contract").  A true and accurate copy of the USMS Contract is attached hereto as **Exhibit F**.

52.     The Corporation's Board duly ratified the Warden's entry into the USMS Contract on behalf of the Corporation at its March 12, 2018 meeting.  A true and accurate copy of the March 12, 2018 meeting agenda and minutes to same are attached hereto as **Exhibit G**.

53.     An important part of the responsibility of the USMS is facilitating the attendance of federal detainees at required judicial proceedings in accordance with court calendars.  In order to accomplish all of these functions, the USMS is responsible for providing the temporary care, custody and housing of federal detainees within a reasonable distance to the federal courts.

54.     The Corporation is required to meet American Correctional Association (ACA) accreditation as well as satisfy ACA re-accreditation every three years. Since its first re-accreditation in 1998 and through its most recent ACA audit in 2017, the Corporation was found to be one hundred percent (100%) compliant with ACA standards.

55.     Since 2008, the Wyatt has undergone nine (9) quality assurance reviews conducted by the USMS. These reviews were conducted in 2008, 2009, 2010, 2011, 2012, 2015, 2016, 2017 and 2018.  Each quality assurance review by the USMS resulted in at least a satisfactory or acceptable rating.

56.     In 2014 and 2017, the Federal Bureau of Prisons ("FBOP") conducted Prison Rape Elimination Act audits and determined that the Wyatt was fully compliant with all the requirements.

57.     Pursuant to the USMS Contract, the Corporation has agreed to accept from the USMS federal detainees awaiting trial in Federal Court.  As also needed, the Corporation accepts adults from the FBOP.

58.     The USMS has designated their detention needs to include adult males and females. The Corporation does not detain juveniles at the Wyatt.

59.     The term of the USMS Contract is for six (6) years and, subject to meeting USMS operating requirements, the earliest date it expires is March 1, 2024.  USMS Contract, § A.11.

60.     After March 1, 2024, either party may terminate the USMS Contract upon 180 days' notice; provided that the Corporation agreed to consult with the USMS at least 90-days prior to any action to terminate the agreement.

61.     The Corporation and USMS agreed that this 90-day notice period (after the earliest termination date of the March 1, 2024) was critical "to allow sufficient time to prepare for loss and replacement of services."  USMS Contract, § A.11.

62.      The USMS Contract is part of the federal government's essential functions.  As a result, "the Federal Government shall be notified, in writing, of all litigation pertaining to this Agreement and provided copies of any pleadings filed or said litigation within 5 working days of

the filing." USMS Contract, § A.12. The Trustee, by and through its undersigned counsel, has provided notice of this Verified Petition for Appointment of Receiver and Complaint contemporaneously to Mr. Mr. Aaron Weisman, the United States Attorney for Rhode Island, as well as the USMS and ICE field offices.

63. During the month of March 2019, the USMS housed on average 515 detainees at the Wyatt.

**D.** **ICE Addendum to USMS Contract**

64. The Corporation began contracting with ICE under the Original IGA. In early 2009, ICE terminated its agreement with the Corporation and withdrew the remainder of the 135 detainees housed at ICE's direction as a result of the death of an ICE detainee.

65. Subsequent to the termination of the original ICE contract, the Corporation made significant changes to its management team and upgrades to its operations. As part of its marketing plan, as early as 2014 the Corporation regularly provided updates to ICE and made outreach to ICE in hopes of engaging a new contractual relationship. To evaluate whether the Wyatt has sufficiently improved operations to begin housing ICE detainees, ICE conducted pre-occupancy inspections in 2014 and 2016 and found no material deficiencies.

66. The Warden provided frequent updates to the Corporation's Board regarding the Corporations' efforts to renew a contractual relationship with ICE, many of these updates are set forth in the Corporation's quarterly financial reports.

67. Prior to the arrival of the ICE detainees in March 2019, ICE officials visited the Wyatt on three occasions, with two visits in late 2018 and one in early January 2019.

68. As a result of these audits and inspections, ICE determined that the Wyatt was run in a safe, humane and clean manner in accordance with ICE's rigorous detention standards.

69. There is no separate agreement with ICE. Rather, on January 9, 2019, the Corporation signed a Modification of Intergovernmental Agreement that expanded the government's use of the Wyatt to include ICE (the "ICE Addendum"). No other material terms were changed to the USMS Contract which remains a single integrated contract. A true and correct copy of the ICE Addendum is attached hereto as **Exhibit H.**

70. At the Board's meeting on January 14, 2019, the Warden provided an update concerning the anticipated return of ICE detainees to the Wyatt. Interim Chairman Albert Gardner, Director Wil Arboleda, and Director Joseph Gonsalves attended the January 14, 2019 meeting.

71. The meeting minutes reflect that the Warden informed the Board that there would not be a separate agreement with ICE, but that "the U.S. Marshal Service had agreed to modify their agreement to allow for up to 225 beds for US Immigration and Customs Enforcement detainees." The Board engaged in a dialogue concerning the use of the Wyatt for ICE detainees. "Chairman Gardner asked if there were any additional questions regarding I.C.E. and there were none." A true and accurate copy of the January 14, 2019 meeting minutes is attached hereto as **Exhibit I**.

72. On March 10, 2019, ICE transferred approximately 133 detainees to the Wyatt. Since their arrival, the Corporation has met or exceeded all requirements established by ICE for the housing of detainees.

73. The average number of ICE detainees housed at the Wyatt in March 2019 was 85. The fixed per-diem rate received by the Wyatt for each ICE detainee is $114.87. Therefore, pursuant to the ICE Addendum, the Wyatt is due to receive approximately $302,900 in additional revenue for the month of March 2019, which amount does not include additional hourly guard rates also subject to the ICE Addendum.

74. As of the date of this Complaint, approximately 60 ICE detainees are being housed at the Wyatt.

**E.** **The Corporation's Financial Distress Prior to the Forbearance Agreement.**

75. As a result of several factors, including the construction cost overruns for the 2005 expansion, prior management alleged malfeasance, and the termination of the ICE agreement in 2009, the Corporation first experienced financial distress in 2009.

76. Between 1994 and 2009, the Corporation paid the City $5,386,130 in Local Impact Fees. The Corporation stopped making impact fee payments to the City in 2009.

77. The Corporation failed to make the requisite debt service on the Bonds starting in 2009, defaulting on its obligations under the Indenture. Notwithstanding these defaults, the Trustee did not move to exercise its remedies as the senior secured creditor to the Corporation.

78. Prior to the 2014 Keepership (defined herein), the Trustee occasionally reduced the balance of the Debt Service Reserve Fund to make the required debt service payments to holders of the Bonds.

**F.** **The 2014 Keepership and Forbearance Agreement**

79. In 2012, Mayor Diossa was elected Mayor for the City and took office in early 2013. Shortly thereafter, the Mayor set his sights on extracting money from the Corporation, regardless of whether the Corporation was in compliance with the Indenture or if it had the financial wherewithal to make any Local Impact Fees to the City.

80. Since 2013, the Mayor has continually appointed new members to the Corporation's five person board, appointing approximately twelve members to the Board of Directors to the Corporation, many of whom have attempted to exercise pressure on the

Corporation to pay impact fee payments to the City in violation of the Corporation's legal commitments.

81.    Upon information and belief, it was a sham when the Mayor influenced the Corporation's Board to file the 2014 Keepership (defined herein) and use the court process to extract funds from the Trustee's Collateral to pay the City, essentially to re-prioritize the City's payments ahead of the Bondholders under the Indenture.

82.    Refusing to accept that the Corporation had no available funds to pay the City any impact fees, upon information and belief, the Mayor orchestrated a sham receivership petition in the Rhode Island Superior Court for the Corporation (the "2014 Keepership").

83.    The Trustee objected to the 2014 Keepership. The Corporation was operationally solvent and there was no need to replace existing day-to-day management with a receiver unfamiliar with the business of operating a detention center.

84.    The Corporation's quarterly financial report for the period immediately before the 2014 Keepership evidenced that from April – June 2014 the Corporation's total operating revenue was $4,960,815 and total expenses were $4,314,719. Thus, the Corporation was operationally solvent by $646,096.

85.    On June 13, 2014, the Rhode Island Superior Court appointment John Savage as temporary receiver of the Corporation.

86.    From and after Mr. Savage's appointment, the Trustee worked closely with the Corporation to preserve the value of the Corporation's assets, including negotiating the terms to modify Mr. Savage's role from a receiver to a keeper.

87.     On September 22, 2014, the Rhode Island Superior Court appointed Mr. Savage as permanent keeper for a term to expire no later than June 30, 2015.  The Keeper Order provided for a process to negotiate a possible defeasance of the Bonds.

88.     The Court's appointment of a Keeper did nothing to increase the value of the enterprise or provide Local Impact Fees to the City under the Indenture.  The 2014 Keepership was a significant administrative cost to the Corporation and depressed the Corporation's revenues.

89.     Subsequent to the appointment of Mr. Savage as Keeper, the USMS slowly decreased its use of the Wyatt and the daily population at the Wyatt went from 523 in July 2014 (the first month after Mr. Savage's appointment) to 469 in December 2014 (the approximate 6 month anniversary of Mr. Savage's oversight).

90.     The City, Corporation, Trustee and Keeper negotiated a resolution of the 2014 Keeper Proceeding pursuant to a four (4) year forbearance agreement, dated March 30, 2015, between and among the Corporation, City and Trustee (the "Forbearance Agreement").  A true and accurate copy of the Forbearance Agreement is attached hereto as **Exhibit J**.

91.     At the time the Forbearance Agreement was finalized on March 30, 2015, the average daily population at the Wyatt for the month of March 2015 had further dropped to 437.

92.     The negative impact of the Corporation's decision to appoint a keeper was severe. While the Corporation enjoyed operational solvency immediately prior to the 2014 Keepership, at the conclusion of the keepership in March 2015, the Corporation reported its first quarter 2015 revenue of $4,303,700 and expenses of $4,595,779 – a negative quarterly operating balance of ($292,079).

93.     Pursuant to the Forbearance Agreement, the Corporation acknowledged that the Trustee's obligations are secured by the Collateral and that Events of Default relating to the Bonds

had occurred, including, but not limited to, the Corporation's failure (i) to pay required debt service on the Bonds on July 15, 2014 and January 15, 2015, pursuant to Indenture § 11.1(i), and (ii) to replenish draws on the Reserve Fund that were made to pay a portion of the debt service then due on the Bonds on January 15, 2011, January 15, 2012, July 15, 2013 and January 15, 2014, pursuant to Section 11.1(viii) of the Indenture.

94. The Trustee agreed to forbear from exercising its rights under the Bond Documents for up to four (4) years, provided that a Termination Event (as defined in the Forbearance Agreement) did not occur.

95. Although the City was not a party to the Indenture, it is a party to the original Forbearance Agreement. The addition of the City to the Forbearance Agreement was to, among other things, (i) confirm the City's ability to receive up to $200,000 in funds from the Corporation, (ii) resolve then pending litigation concerning the Fink Property, and (iii) confirm that the City would abide by Rhode Island law and not interfere with the governance at the Wyatt.

96. The Forbearance Agreement does not provide for Local Impact Fees. Rather it provides for monthly payment of $16,666 to the City "to the extent there are funds available subsequent to payment of operation and maintenance expenses of the Corporation" (the "City Payments under Forbearance Agreement"). Forbearance Agreement, § 2.1.

97. Absent the Forbearance Agreement, the City Payments under Forbearance Agreement would have been paid to the Trustee for the benefit of the holders of the Bonds.

**G.    Corporation's Performance Under the Forbearance Agreement and Forbearance Amendments**

98. The Corporation's Board resumed oversight of the Corporation in April 2015.

99. The Corporation recognized that its viability depended upon increasing its daily population and, at the Board's direction, it immediately took action to position the Wyatt as a

facility that routinely met and exceeded the ACA and other operational standards for a correctional institution.

100.    In its first quarterly financial report after the 2014 Keepership, the Corporation stated that "Warden Martin continues to communicate with officials from the U.S. Department of Homeland Security Immigration and Customs Enforcement (ICE) division to provide beds to house ICE detainees."

101.    In each of the Corporation's following 14 quarterly financial reports (i.e., remainder of 2015, all of 2016, 2017 and 2018), the Corporation provided notice to the public that the Wyatt determined it was ready, willing and able to accept ICE detainees.

102.    From March 2015 to August 2017 the Corporation made the City Payments under Forbearance Agreement of $16,666 per month and the Corporation slowly returned to its pre-2014 Keepership census.

103.    The Corporation's quarterly financial report for the October-December 2016 period reflects that the Wyatt's average daily population in December 2016 was 523 and its operating revenue for such quarterly period was $5,139,771, and expenses were $4,995,451, resulting in operational solvency of $144,320 for that quarterly period.

104.    On December 31, 2016, a USMS detainee escaped from the Wyatt. Thereafter, the USMS conducted a complete review of the Corporation's operations.  During this investigation period, the USMS immediately reduced the number of its detainees at the Wyatt until the USMS determined that the Corporation addressed the stated USMS deficiencies.

105.    The average daily population at the Wyatt immediately before the detainee escape in December 2016 was 515 and the average daily population dropped the next month to 432 in

January 2017.  The average daily population continued to decline until it hit its nadir of 370 for the month of May 2017.

106.    In the spring of 2017, the USMS identified several areas of capital improvements that must be made by the Corporation in order to resume its pre-escape level of average daily population.

i. *First Amendment to Forbearance Agreement*.

107.    Due to the Corporation's financial distress, the Corporation requested the Trustee to advance it funds from the Trustee's Debt Service Reserve Fund in order to complete most of the USMS identified capital improvements.

108.    Pursuant to the terms of that certain Amendment to Forbearance Agreement, dated May 3, 2017, the Trustee made available approximately $900,000 to fund capital expenses and budgeted operational shortfalls (the "First Amendment to Forbearance Agreement").  A true and accurate copy of the First Amendment to Forbearance Agreement is attached hereto as **Exhibit K**.

109.    The City refused to enter into the First Amendment to Forbearance Agreement. Upon information and belief, the City's refusal was due to its concerns that if it acknowledged the Corporation's financial distress and inability to make payments to the City, that such acknowledgement would be interpreted by the public electorate as a sign of weakness of the Mayor or City.

110.    The Corporation has not made any City Payments under Forbearance Agreement since August 2017.  The First Amendment to Forbearance Agreement set forth the process and time period by which any such payments could resume.

111.    Article 2.1 of the Forbearance Agreement was amended to provide that if the Corporation experienced an operational expense shortfall and required funding from the Trustee

to meet its most essential operating expenses, that the Corporation would be prohibited in making any monthly City Payments under Forbearance Agreement for a period of 60 days from such budget shortfall requests.

### ii.   *Second Amendment to Forbearance Agreement.*

112.    In 2018, the Corporation once again requested financial support from the Trustee to advance additional funds from the Debt Service Reserve Fund to enable the Corporation to complete additional capital improvements requested by the USMS, including the completion of a construction of a portion of its perimeter fence (the "Fence Project").

113.    In March 2018, the Trustee agreed to further amend the Forbearance Agreement pursuant to the terms and conditions under that certain Second Amendment to Forbearance Agreement, dated March 12, 2018.   A true and accurate copy of the Second Amendment to Forbearance Agreement is attached hereto as **Exhibit L**.

114.    Pursuant to the Second Amendment to Forbearance Agreement, the Trustee advanced up to $388,000 to meet one half (1/2) of the Corporation's financial needs for the Fence Project.  The balance of the Fence Project would be reimbursed by the USMS.

### iii.   *Third Amendment to Forbearance Agreement*

115.    As was widely reported in the news, the federal government experienced an unprecedented 35 day partial government shutdown between December 2018 and late January 2019.  Substantially all of the Corporation's revenues at that time came from the USMS.

116.    On January 4, 2019, the Corporation was advised by the USMS that as a result of an absence of appropriations to the USMS due to the ongoing partial federal government shutdown, the USMS was unable to process payments for detainees and prisoners being housed in IGA facilities, such as the Wyatt.  The USMS further advised that all unpaid invoices will be

processed under the federal Prompt Payment Act when the Federal Prisoner Detention appropriation is funded.

117.     Absent receipt of revenues from the USMS, the Corporation would not be able to meet its most basic operating expenses, including meeting the payroll needs of over 210 employees (over 150 of which are union members).  Without immediate funding, the Corporation would have ceased operations.

118.     Given the Corporation's long history of financial distress and uncertainty over the government shutdown, the Corporation had no ability to obtain a loan sufficient to meet its operating needs.

119.     In early 2019, the Corporation requested the Trustee to advance funds to the Corporation to meet essential budgeted expenses, including payroll. The Trustee agreed to make such protective advances under the Indenture pursuant to the terms and conditions of that certain Third Amendment to Forbearance agreement.  A true and accurate copy of the Third Amendment to Forbearance Agreement is attached hereto as **Exhibit M**.

120.     In addition to meeting its emergency bridge financing needs, the purpose of the Third Amendment to Forbearance Agreement was to extend the forbearance termination from January 16, 2019 to July 16, 2019, to allow the Corporation and Trustee additional time to evaluate all options to meet the competing needs of the stakeholders.  Specifically, the Third Amendment to Forbearance Agreement established a process by which the Corporation would evaluate all strategic alternatives, including a sale or affiliation of the business.

121.     At the time of the final negotiations of the Third Amendment to Forbearance Agreement, Kerry Walsh, counsel to the Corporation met with the Mayor and the City Solicitor, Matthew Jerzyk, to inform the City about the bridge financing and the scheduled Board meeting

on January 18, 2019 to authorize the Third Amendment to Forbearance Agreement. While the City has remained routinely informed concerning the operations of the Wyatt, upon learning the terms of the draft Third Amendment to Forbearance Agreement, the City began its onslaught of attempts to shut down the Wyatt and cause irreparable harm to the Corporation and its assets.

122. As set forth in the Third Amendment to Forbearance Agreement, the Corporation acknowledged that: (i) obligations under the Indenture constitute valid and binding obligations of the Corporation; (ii) the outstanding principal amount of the Bonds as of the January 16, 2019 was $97,300,000; (iii) the accrued and unpaid interest on the Bonds as of January 15, 2019 was $32,513,754.06; and (iv) the Corporation's obligations under the Bond Documents are not subject to any defense, set-off, reduction, claim or counterclaim of any kind or nature whether at law or in equity.

123. As with all prior amendments, the Corporation represented in the Third Amendment to Forbearance Agreement that: (i) all representations and warranties of the Corporation under the Third Amendment to Forbearance Agreement were true and correct as of the date signed, and shall survive the execution or termination of the amendment; and (ii) the Corporation was authorized to enter into the amendment and, upon execution and delivery hereof, the amendment was a legal and binding obligation of the Corporation.

124. The Third Amendment to Forbearance Agreement was authorized by the Board on January 22, 2019. The next business day, the Trustee made available to the Corporation funds under the agreement to meet its immediate weekly payroll expenses.

125. On February 19, 2019, the Corporation satisfied all of its obligations to the Trustee under the bridge loan under the Third Amendment to Forbearance Agreement and the parties terminated that emergency loan.

*iv. Termination of the Forbearance Agreement.*

126.     The Forbearance Agreement provides that upon the occurrence of certain defined Termination Events, the Forbearance Agreement will automatically terminate.

127.     On April 10, 2019, the Trustee provided written notice to the Corporation that the Forbearance Agreement terminated pursuant to Section 4.2(ii) of the Forbearance Agreement. Specifically, the Forbearance Agreement terminated due to (i) the City's passage of the April 2019 Resolutions, (ii) the Bill to Dissolve Corporation introduced in the Rhode Island General Assembly on April 4, 2019, and (iii) the Board of Directors' April 5, 2019 vote to cause the ICE Suspension. Each of the foregoing actions directly challenges the validity, enforceability, priority and extent of the Trustee's liens, claims and/or interests with respect to the Bonds and related Bond Documents. A true and accurate copy of the letter terminating the Forbearance Agreement is attached hereto as **Exhibit N**.

128.     Pursuant to Section 4.3 of the Forbearance Agreement, upon the occurrence of a Termination Event, the Trustee is authorized to exercise all remedies under the Bond Documents, including filing this complaint and seeking the appointment of a receiver.

## H.     The City's Efforts to Impair the Bonds

129.     On or about January 25, 2019, the Mayor reached out directly to then Board Chairman Albert Gardner and requested that the Board reconvene a meeting to reconsider the vote to authorize the Third Amendment to Forbearance Agreement.

130.     Mr. Gardner replied that the Board would not hold such a meeting because the Board had already voted and the Corporation accepted the advance of funds from the Trustee to meet its payroll obligations.  A true and accurate copy of Mr. Gardener's affidavit is attached hereto as **Exhibit O.**

131.   Shortly after the January 22, 2019 Board meeting, Directors Gardener and Gonsalves resigned.

    *i.*    *The City Refiles the Fink Litigation to Impair the Bonds.*

132.   The City filed a sham declaratory judgment complaint to impair the Bonds on February 10, 2019 when it filed a nearly identical complaint to one that it dismissed against the Corporation in 2014 (the "Second Fink Complaint").   Disguised as a complaint seeking an interpretation of the law, the complaint was filed for leverage to extract money from the Corporation ahead of the Trustee on the Bonds.

    *ii.*    *The City Council Votes to "Disapprove" of the Wyatt and Corporation; Takes Steps to Impair the Bonds.*

133.   On April 3, 2019, the Mayor called a special meeting of the City Council to consider resolutions that may effectuate the dissolution of the Corporation.  A true and accurate copy of the City Council agenda is attached hereto as **Exhibit P**.

134.   At the April 3, 2019 City Council meeting, the City Council passed the following two resolutions (the "April 2019 Resolutions"):

    (i)    "Resolution of the Central Falls City Council rescinding, withdrawing, denouncing, invalidating and terminating the August 5, 1991 Resolution Regarding Central Falls Detention Facility Corporation" and

    (ii)    "Resolution of the Central Falls City Council rescinding, withdrawing, denouncing, invalidating and terminating the August 5, 1991 'City Council Resolution of Approval' Regarding the Central Falls Detention Facility Corporation."

True and accurate copies of the April 2019 Resolutions adopted by the City Council are attached hereto as **Exhibit Q**.

135.   The City's actions on April 3, 2019 to rescind, withdraw, denounce, invalidate and terminate the Corporation impairs the Bonds.  If by the City's actions the Corporation no longer

exists, the Corporation has no authority to transact business and meet its obligations to the Trustee, USMS, ICE, over 210 employees, and many trade creditors.

       *iii.*    *State Representative Introduces Legislation to Dissolve the Corporation.*

136.    The day after the City's April 2019 Resolutions were adopted, State Representative for the City, Shelby Maldonado, introduced House Bill 2019-H5959 to amend the Detention Center Act (the "Bill to Dissolve Corporation").  If passed, that bill would result in an impairment of contract and takings claim under both the State and U.S. Constitution.  A true and accurate copy of the Bill to Dissolve Corporation is attached hereto as **Exhibit R**.

137.    Upon information and belief, Representative Maldonado conferred and coordinated with the Mayor and representatives for the City in drafting the proposed legislation.

138.    Should the Bill to Dissolve Corporation become law, the following results would cause immediate and irreparable harm to the Trustee:

- Dissolution of the Corporation;

- Elimination of the Corporation's tax exempt status;

- Taxing the Fink Property to prevail on the City's claims under Second Fink Litigation.

139.    The dissolution of the Corporation would remove its powers to operate, thus eliminating the revenues pledged to pay the Bonds and irreparably harming the Trustee's security interest in, and lien on, the Bonds.

140.    The elimination of the Corporation's tax exempt status would impair the Indenture and other Bond Documents and irreparably harm the Trustee's security interest in, and lien on, the Bonds.

141.    The State of Rhode Island expressly pledged in the Detention Center Act as follows:

    The state pledges to and agrees with the holders of any bonds or

notes issued by the corporation, that the state will not limit or alter the rights vested in the corporation to fulfill the terms of any agreements made with the holders until those bonds or notes, together with their interest, with interest on any unpaid installments of interest, and all costs and expenses in connection with any action or proceeding by or on behalf of the holders, are fully met and discharged. The corporation is authorized to include this pledge and agreement of the state in any agreement with the holders of the bonds or notes.

R.I. Gen. Laws § 54-45-21.

142.     As set forth in Section 21 above, the Corporation included the State's pledge in the Indenture at section 14.11, which provides:

> Section 14.11 **Pledge of State of Rhode Island**.  Pursuant to the Act, the State of Rhode Island pledges to and agrees with the holders of any Bonds that the State of Rhode Island will not limit or alter the rights vested in the Corporation to fulfill the terms of any agreements made with the holders until the Bonds, together with the interest thereon, with interest on any unpaid installments of interest, and all costs and expense in connection with any action or proceeding by or on behalf of the holders, are fully met and discharged.

Indenture, § 14.11.

143.     The Bill to Dissolve Corporation, if passed, would be in direct violation of the State's pledge.  The Trustee is owed in excess of $130 million on the Bonds, plus costs and expenses provided therein and under the Detention Center Act.

144.     The holders of the Bonds invested in the Corporation in reliance on the State's pledge.  The dissolution of the Corporation would result in both a state and federal impairment of contract and takings claim, exposing the State to over $130 million in damages, plus expenses and costs.

*iv.*     *The Board of Directors Vote to Suspend the ICE Addendum.*

145.     Since January 2019, the Mayor appointed three new Board members, two of which were appointed on April 3, 2019, only two days before the scheduled vote concerning the ICE Addendum.

146.     Defendants Molina Flynn and Yip were nominated by the Mayor, and appointed to the Board of Directors by the City Council at a special meeting held on April 3, 2019. This was the same meeting at which the City Council voted to rescind the City's approval for the Corporation under the April 2019 Resolutions.

147.     In anticipation of the Mayor's appointment of Defendants Molina Flynn and Yip to the Board of Directors, the Board called a special meeting to consider or act on a motion regarding the ICE Addendum.  A true and accurate copy of the Board of Directors' April 5, 2019 meeting Agenda is attached hereto as **Exhibit S.**

148.     At the April 5, 2019 meeting, the members of the Board of Directors (i) voted to "suspend" the ICE Addendum for a period of ninety (90) days, and (ii) directed the Warden to return all immigrant detainees to ICE custody within seven (7) days (the "ICE Suspension").  A true and accurate copy of the Providence Journal article so reporting entitled, "Wyatt board suspends ICE contract, Orders Warden to Return Detainees," published on April 5, 2019, as updated on April 6, 2019, is attached hereto as **Exhibit T**.

149.     The Board of Directors directed the Warden to carry out the ICE Suspension and upon information and belief, the Warden therefore notified ICE of the Board's direction.

150.     If the ICE Suspension is not enjoined, the Trustee would be irreparably harmed.

## COUNT I
## PETITION FOR APPOINTMENT OF RECEIVER
### *(As against the Corporation)*

151.     Paragraphs 1-150 are hereby incorporated by reference as if stated fully herein.

152.     The Trustee seeks to protect the value of its Collateral.

153.     The Corporation owned and has possession of all or a portion of the Collateral.

154.     The Indenture is a legally binding contract that the Corporation entered into and that the Trustee may enforce.

155.     Events of Default have occurred under the Indenture.

156.     The Trustee has met all conditions precedent for the relief sought herein under the terms of the Indenture.

157.     The Indenture provides that upon an Event of Default, the Trustee can, *inter alia*, enforce any remedy provided by the Mortgage.  Indenture, § 11.2(a)(v).

158.     The Mortgage provides that the Trustee "shall be entitled to the appointment of a receiver . . . [and the Corporation has] consented to the appointment of such receiver."  Mortgage, § 7.2(c).

159.     The Collateral is in danger of being lost or materially injured.

160.     The value of the Collateral is not sufficient to discharge the amount of the indebtedness owed to the Trustee.

161.     The appointment of a receiver is necessary to protect and preserve the Trustee's rights and interests as a mortgagee and secured creditor with a lien on the Collateral, to secure ample justice for the Trustee, and to ensure that the Collateral is preserved, protected, and operated effectively during the pendency of these proceedings.

162. The Trustee requests that such receiver be given all powers necessary and usual in such cases for the protection, possession, and control of the Corporation during the pendency of this action.

## COUNT II
## BREACH OF DETENTION CENTER ACT
*(As against City, Mayor, City Council, Board of Directors, and Corporation)*

163. Paragraphs 1-162 are hereby incorporated by reference as if stated fully herein.

164. R.I. Gen. Laws § 45-54-1 et seq. is treated as a contract because the language of its text and the circumstances of its enactment evince a legislative intent to create private rights of a contractual nature enforceable against the state.

165. R.I. Gen. Laws § 45-54-5 requires that each newly appointed member of the board of directors "take an oath to support the constitution and laws of the state and the constitution of the United States and to faithfully and impartially discharge the duties of his or her office."

166. Upon information and belief, the Corporation has been operating with a Board of Directors that has been acting in furtherance of the Mayor's directives, rather than in furtherance of the interests of the Corporation or its creditors.

167. R.I. Gen. Laws § 45-54-7 provides that "the [C]orporation is not required to pay any taxes or assessments upon the projects or upon any property acquired, or upon the income from the projects, or any other state or local tax of any kind or description . . . ."

168. The City's filing of the Second Fink Complaint in 2019 sought to impose property taxes to be paid by the Corporation in direct violation and breach of R.I. Gen. Laws § 45-54-7.

169. The Corporation has been harmed and the rights of the Trustee impaired because the Corporation and Trustee have been forced to spend attorneys' fees and resources fending off the City's frivolous attempts to extract payments from it.

170. R.I. Gen. Laws § 45-54-18 provides that "the corporation is not authorized to do anything which will impair the security of the holders of the obligations of the corporation or violate any agreements with them or for their benefit."

171. The Board of Director's actions in suspending the ICE Addendum as part of the USMS Contract and to expel all ICE detainees for at least 90 days is in direct violation and breach of R.I. Gen. Laws § 45-54-18.

172. Pursuant to R.I. Gen. Laws § 45-54-21, the state "pledge[d] to and agree[d] with the holders of any bonds or notes issued by the corporation, that the state will not limit or alter the rights vested in the corporation to fulfill the terms of any agreements made with the holders until those bonds or notes, together with their interest, with interest on any unpaid installments of interest, and all costs and expenses in connection with any action or proceeding by or on behalf of the holders, are fully met and discharged."

173. The City's, the Mayor's, and the City Council's actions have hindered the Corporation's ability to satisfy its obligations to the Trustee under the Indenture in direct violation and breach of R.I. Gen. Laws § 45-54-21.

174. These statutory violations and breaches have damaged the value of the Corporation, hindered its ability to meet its contractual obligations to the federal government, and impaired the rights of the bond holders, causing the Trustee damages in an amount to be determined at trial, but no less than $130 million dollars, plus attorneys' fees and costs (as authorized by R.I. Gen. Laws § 45-54-21).

## COUNT III

### BREACH OF INDENTURE
*(As against Corporation and Board of Directors)*

175. Paragraphs 1-174 are hereby incorporated by reference as if stated fully herein.

176.     The Indenture is a legally binding contract that the Corporation entered into and that the successor Trustee now has the authority to enforce.  Indenture, § 7.4.

177.     The Corporation entered into financial distress in approximately 2009 and thereafter defaulted on its obligations pursuant to §§ 3.1, 7.1 and 11.1 of the Indenture to make scheduled payments on the Bonds.

178.     Despite the Events of Default, the City, Corporation, and Trustee entered into the Forbearance Agreement in 2015.

179.     The Corporation acknowledged the existence and continuance of Events of Default under the Indenture in connection with its entry into the Forbearance Agreement.  The Trustee agreed to forbear on exercising its rights under the Bond Documents for four (4) years so long as a Termination Event did not occur.

180.     The Forbearance Agreement terminated by notice to the Corporation on April 10, 2019, due to (i) the City's passage of the April 2019 Resolutions, (ii) the Bill to Dissolve Corporation introduced in the Rhode Island General Assembly on April 4, 2019, and (iii) the Board of Directors' April 5, 2019 vote to cause the ICE Suspension.

181.     Pursuant to Section 4.3 of the Forbearance Agreement, the Trustee is authorized under the Bond Documents to exercise all remedies.

182.     The Indenture provides that upon an Event of Default, the Trustee can, inter alia, commence a legal action upon the Bonds to "enjoin any acts or things which may be unlawful or in violation of the rights of the Owners of the Bonds" and enforce "any remedy provided by the Mortgage."  Indenture, § 11.2(a) (iv) and (v).

183.     The Mortgage in turn provides that upon an Event of Default, the Trustee may, *inter alia*, take possession of and foreclose on the Mortgage Collateral and have a receiver appointed to

take possession of the Mortgage Collateral and stand in the Corporation's shoes.  Mortgage, §§ 7.2(a) and (c).

184.    The Indenture also provides that in "the enforcement of any remedy under [it], the Trustee shall be entitled to sue for" and collect "any and all costs and expenses of collection and of all proceedings hereunder and under the Bonds, including reasonable attorneys' fees . . ." Indenture, § 11.2 (d).

185.    As a result of the Corporation's entry into the Events of Default, the Trustee has been harmed and it is entitled to the aforementioned relief, including having a receiver appointed to take possession of the Collateral, and collect the attorneys' fees, costs and interest incurred in enforcing the Bond Documents.

## COUNT IV
## BREACH OF MORTGAGE
### *(As against Corporation and Board of Directors)*

186.    Paragraphs 1-185 are hereby incorporated by reference as if stated fully herein.

187.    The Mortgage is a legally binding contract that the Corporation entered into and that the successor Trustee now has the authority to enforce.

188.    An Event of Default under the Indenture is an Event of Default under the Mortgage. Mortgage, § 7.1(b).

189.    The Mortgage also provides that the Corporation "shall, on demand, reimburse Mortgagee [the Trustee] for all advances made and expenses incurred by the Mortgagee in curing any [] default (including, without limitation, reasonable attorneys' fees) together with interest thereon . . . from the date that an advance is made or expense is incurred, to and include the date the same is paid."  Mortgage, § 4.17 (c).

190. The Mortgage also requires the payment of "reasonable attorneys' fees" incurred by the Trustee in foreclosing on the Mortgage Collateral. Mortgage, § 7.2 (a).

191. Following an Event of Default, the Mortgage authorizes the Trustee to, *inter alia*, bring suit to take possession of and foreclose on the Mortgage Collateral and have a receiver appointed to take possession of the Mortgage Collateral and stand in the Corporation's shoes. Mortgage, §§ 7.2(a) and (c).

192. As a result of the Corporation's entry into the Events of Default, the Trustee has been harmed and it is entitled to the aforementioned relief, including its attorneys' fees, costs and interest.

## COUNT V
## BREACH OF USMS CONTRACT
### *(As against Corporation)*

193. Paragraphs 1-192 are hereby incorporated by reference as if stated fully herein.

194. The USMS Contract is part of the Trustee's Collateral under the Bond Documents.

195. The Trustee has a private right of action to enforce the USMS Contract. R.I. Gen. Laws, § 45-54-14.

196. The Board of Directors authorized the Warden to handle the day-to-day management of the Corporation and to enter into such contracts as were necessary for its proper and efficient operation.

197. In accordance with that authorization, the Warden entered into the USMS Contract on March 1, 2018.

198. The Board of Directors explicitly voted to ratify the Warden's entry into the USMS Contract at a Board of Directors meeting on March 12, 2018.

199. The Warden later executed the two-page ICE Addendum on January 9, 2019.

200. That addendum simply adds ICE as a party to the USMS Contract; it does not change or add any material terms.

201. According to the minutes of the Board of Director's meeting on January 14, 2019, the Board of Directors was fully informed of and supported the Warden's efforts to "piggy back on the current United States Marshal contract" to bring ICE detainees back to the Wyatt.

202. The Directors even inquired "how many [ICE] detainees the facility could house," and when the Chairman inquired whether "there were any additional questions regarding I.C.E.," "there were none."

203. Following the execution of the ICE Addendum, the Corporation accepted and retained its benefits by accepting the revenues generated by ICE detainees.

204. As a result, the Corporation ratified the ICE Addendum and the fully integrated contract is legally binding upon it.

205. The Trustee is authorized by R.I. Gen. Laws § 45-54-14, the Indenture, § 11.2(a), and common law to cause the Corporation to comply with its obligations under the USMS Contract.

206. The initial term of the USMS Contract is six (6) years and it does not expire until at least March 1, 2024. USMS Contract, § A.11.

207. The Corporation is not permitted to terminate the USMS Contract until after that date. *Id.*

208. Moreover, the Corporation has no right to suspend its performance for any reason. *Id.*

209. Nevertheless and in clear breach of the USMS Contract, the Corporation's Board of Directors voted on April 5, 2019 to suspend the January 9, 2019 ICE Addendum to the integrated

USMS Contract for a 90 day period and directed the Corporation to make arrangements for the removal of ICE detainees within 7 days.

210.     The Board of Director's and Corporation's attempt to suspend and terminate the revenue streams supporting the Corporation's operations (and therefore, its ability to meet its obligations to the Trustee) has impaired the value of the Corporation and harmed the Trustee.

211.     The Trustee is therefore entitled to compel the Corporation's performance of the USMS Contract.

**COUNT VI**
**TORTIOUS INTERFERENCE WITH INDENTURE**
*(As against City, Mayor, City Council, and Board of Directors)*

212.     Paragraphs 1-211 are hereby incorporated by reference as if stated fully herein.

213.     The Indenture is a legally binding contract between the Corporation and the Trustee.

214.     The City, the Mayor, the City Council, and the Board of Directors have actual knowledge of this contract.

215.     The City, the Mayor, and the City Council have intentionally interfered with the Corporation's performance under the Indenture without justification by, *inter alia*:

- filing the sham Second Fink Complaints to extract money from the Corporation ahead of the Trustee on the Bonds;

- passing the April 2019 Resolutions aimed at the ultimate termination of the Corporation's existence;

- shepherding proposed State legislation aimed at taxing and dissolving the Corporation in direct violation of existing State law; and

- improperly directing and/or influencing the Board of Directors to suspend (and possibly terminate) the Corporation's primary revenue generating contract.

216.    The Board of Directors has also intentionally interfered with the Indenture, without justification, by voting to suspend the USMS Contract, which contains no provision allowing such suspension, thereby impairing the revenue stream of the Corporation and its ongoing viability, with no purpose other than to meet the Mayor's politically motivated demand to oust ICE and close the Wyatt in its entirety.

217.    These actions have harmed the Trustee by impairing the value of the Corporation and diminishing and eliminating its ability to satisfy its financial obligations to the Trustee under the Indenture.

218.    As a result, the Trustee has been damaged in an amount to be determined at trial, in excess of $130 million dollars.

**COUNT VII**
**TORTIOUS INTERFERENCE WITH MORTGAGE**
*(As against City, Mayor, City Council, and Board of Directors)*

219.    Paragraphs 1-218 are hereby incorporated by reference as if stated fully herein.

220.    The Mortgage is a legally binding contract between the Corporation and the Trustee.

221.    The City, the Mayor, the City Council, and the Board of Directors have actual knowledge of the Mortgage.

222.    The Mortgage grants the Trustee a security interest in all of the Corporation's revenue and accounts, instruments, documents and general intangibles, including the USMS Contract.  Mortgage, § 1.1(d) and (m).

223.    The City, the Mayor, and the City Council have intentionally interfered with the Mortgage,  by, inter alia:

- passing the April 2019 Resolutions aimed at the ultimate termination of the Corporation's existence;

- shepherding proposed State legislation aimed at taxing and dissolving the Corporation  in direct violation of existing State law; and

- improperly directing and/or influencing the Board of Directors to suspend (and possibly terminate) the Corporation's primary revenue generating contract.

224.     The Board of Directors has also intentionally interfered with the Mortgage, without justification, by voting to suspend the USMS Contract, which contains no provision allowing such suspension, thereby impairing the revenue stream of the Corporation and its ongoing viability, with no purpose other than to meet the Mayor's demand to oust ICE and close the Wyatt in its entirety.

225.     The Trustee has been harmed by the intentional destruction of the Corporation's value and the impairment of its rights in an amount to be determined at trial, in excess of $130 million dollars.

<u>COUNT VIII</u>
**TORTIOUS INTERFERENCE WITH USMS CONTRACT**
*(As against City, Mayor, City Council, and Board of Directors)*

226.     Paragraphs 1-225 are hereby incorporated by reference as if stated fully herein.

227.     The USMS Contract is a legally binding contract between the Corporation, the US Marshals, and ICE.

228.     The USMS Contract is part of the Trustee's Collateral under the Bond Documents.

229.     The Trustee has a private right of action to enforce the USMS Contract.  R.I. Gen. Laws, § 45-54-14.

230.     The City, the Mayor, the City Council, and the Board of Directors have actual knowledge of the USMS Contract.

231. The City, the Mayor, and the City Council have intentionally interfered with the Corporation's performance of the USMS Contract without justification by, *inter alia*:

- passing the April 2019 Resolutions aimed at the ultimate termination of the Corporation's existence;

- shepherding proposed State legislation aimed at taxing and dissolving the Corporation in direct violation of existing State law; and

- improperly directing and/or influencing the Board of Directors to suspend (and possibly terminate) the Corporation's primary revenue generating contract.

232. The Board of Directors has also intentionally interfered with the USMS Contract, without justification, by voting to suspend it, despite the fact that it contains no provision allowing such suspension, thereby impairing the revenue stream of the Corporation and its ongoing viability, with no purpose other than to meet the Mayor's politically motivated demand to oust ICE and close the Wyatt in its entirety.

233. The Trustee has been harmed by the intentional destruction of the Corporation's value and the impairment of its rights in an amount to be determined at trial, in excess of $130 million dollars.

<u>**COUNT IX**</u>
**BREACH OF FIDUCIARY DUTY**
*(Defendants Arbodelda, Berdugo, Molina Flynn, Yip)*

234. Paragraphs 1 - 233 are hereby incorporated by reference as if stated fully herein.

235. The members of the Board of Directors are obligated "to support the constitution and laws of the state and the constitution of the United States and to faithfully and impartially discharge the duties of his or her office." R.I. Gen. Laws § 45-54-5.

236. The members of the Board of Directors owe fiduciary duties, including fiduciary duties of care and loyalty, to the Corporation and its constituents. In their capacity as fiduciaries,

Defendants Arbodelda, Berdugo, Molina Flynn, and Yip have the obligation to undertake their duties to the Corporation in good faith, including, without limitation, (i) to supervise and monitor the affairs of the Corporation, (ii) to promptly and thoroughly disclose any conflicts of interest with the Corporation, (iii) to exercise independent judgment on behalf of the Corporation, and (iv) to act in a manner consistent with the best interests of the Corporation.

237. The Corporation's ongoing contractual relationship with ICE is in the best interests of the Corporation. The ICE Addendum generates substantial revenue for the Corporation.

238. The Warden was duly authorized to execute the USMS Contract in March 2018.

239. The January 2019 ICE Addendum is not a separate contract.

240. The ICE Addendum was fully discussed with the Board at its January 14, 2019 meeting, and the Board's questions to the Warden and Corporation's counsel were fully answered. The Board raised no concerns about the ICE Addendum until its April 5, 2019 meeting.

241. The Board of Directors' vote to suspend the Corporation's detention of ICE detainees for 90 days and to request the return all immigrant detainees to ICE custody within 7 days pursuant to its ICE Suspension vote is not in the best interests of the Corporation.

242. The ICE Suspension, if enforced, will result in significant lost revenues to the Corporation and will expose the Corporation to substantial liability.

243. The ICE Suspension is a breach of the USMS Contract by the Corporation and exposes the Corporation to damages related thereto.

244. The ICE Suspension violates the Corporation's obligation under R.I. Gen. Laws § 45-54-18 not to "do anything which will impair the security of the holders of the obligations of the corporation or violate any agreements with them or for their benefit."

245.     Therefore, as a direct and proximate result of the Board of Director's breach of their fiduciary duties to the Corporation, (i) the Corporation has been exposed to potential damages to ICE for breach of contract; (ii) the Corporation has and will continue to lose significant revenue and (iii) the security of the Trustee's interests in the Corporation has been impaired.

**COUNT X**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
*(As Against Defendant Diossa)*

246.     Paragraphs 1-245 are hereby incorporated by reference as if stated fully herein.

247.     Although the Mayor has the power to appoint the members of the Board of Directors, his power over the Corporation's affairs ends there. The Mayor has acknowledged his limited legal relationship to the Corporation's Board as set forth in the Forbearance Agreement.

248.     As the Mayor is aware, the appointed members of the Board of Directors owe a fiduciary duty to the Corporation, not to the City or the Mayor.

249.     Upon information and belief, the Mayor nominated Defendants Berdugo, Molina Flynn and Yip to the Board of Directors in early 2019, because they would take actions at the Mayor's direction to terminate the Corporation's contract with ICE, and ultimately close the Wyatt.

250.     Upon information and belief, the Mayor directed the Board of Directors to hold an emergency meeting on Friday, April 5, 2019 for the purpose of invalidating the ICE Addendum without cause.

251.     An emergency meeting of the Board of Directors was held on April 5, 2019, at which the Board of Directors approved the ICE Suspension.

252.     The Board of Directors violated their fiduciary duties to the Corporation by virtue of the vote to cause the ICE Suspension.

253. Upon information and belief, the Mayor was aware that impairment of the USMS Contract would occur if the Board of Directors voted to terminate or suspend the ICE Addendum.

254. Upon information and belief, the Mayor was also aware that such impairment violates the Indenture and statutory laws, including but not limited to R.I. Gen. Laws, § 18.

255. Upon information and belief, the Mayor actively participated in or encouraged the Board of Directors to vote to terminate and/or suspend the ICE Addendum and to remove the ICE detainees from the Wyatt.

256. The Mayor's conduct aided and abetted the Board of Directors' breach of their fiduciary duties to the Corporation.

## COUNT XI
## DECLARATORY JUDGMENT

257. Paragraphs 1-256 are hereby incorporated by reference as if stated fully herein.

258. R.I. Gen. Laws § 45-54-14 provides that any:

> trustee under the trust agreement . . . may, by civil action, mandamus, or other proceeding, protect and enforce any and all rights under the laws of the state or granted under [the Detention Center Act] or under the trust agreement or the resolution authorizing the issuance of the bonds, and may enforce and compel the performance of all duties required by [the Detention Center Act] or by the trust agreement or resolution to be performed by the corporation or by any officer of the corporation . . .

259. The City's actions in seeking to shut down the Wyatt, dissolve the Corporation and render it unable to perform the valid contracts it has entered into with the federal government and the Trustee, are in direct violation of the City's obligation under R.I. Gen. Laws § 45-54-21 not to interfere with the Corporation's duties to fulfill its contractual obligations to the holders of the Bonds.

260. Moreover, the Detention Center Act, § 45-54-26, provides that insofar as its provisions are "inconsistent with the provisions of any charter or other law or ordinance, general,

special, or local, or of any rule or regulation of the state or any municipality, the provisions of [the Detention Center Act] are controlling."

261.     The April 2019 Resolutions, which seek to disapprove of and ultimately dissolve the Corporation (rendering it unable to perform its contracts and unable to fulfill its obligations to the bond holders) are inconsistent with the Detention Center Act's provisions.

262.     Nothing in the Detention Center Act authorizes the City's attempts to revoke the power of the duly created Corporation.

263.     To the contrary, the State is prohibited from interfering with the Corporation's ability to meet its obligations to its bond holders.

264.     Indeed, the City's actions to terminate the Corporation irreparably harm the holders of the Bonds and render the City (and potentially the State) exposed to over $130 million in damages to the holders of the Bonds that invested in the Corporation under the statutory commitment of non-interference.

265.     Since the April 2019 Resolutions are inconsistent with the Detention Center Act, they are ineffective and not controlling on the Corporation.

266.     Accordingly, an actual and justiciable controversy now exists concerning the City's power to interfere with the Corporation's business and contracts and concerning the legality of the City's attempt to terminate and rescind the Corporation's existence.

267.     Therefore, the Trustee is entitled to a declaration that the April 2019 Resolutions are null and void and a preliminary order pending that declaration protecting and enforcing its rights and compelling the performance of all duties required by law, contract, and/or the Indenture.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff UMB Bank, NA respectfully requests that the Court enter judgment in its favor and against Defendants the City, the Mayor, the City Councilors Maria Rivera, Jonathan Acosta, Hugo Figuero, Franklin Solano, and Thomas Lazieh, Board of Directors Wilder Arbodelda, Gary Berdugo, Joseph Molina Flynn and Herman Yip, granting the following relief:

A.  Grant a temporary restraining order and thereafter a preliminary injunction Appoint a receiver in the manner requested herein and set forth under separate motion;

B.  As to Count II (Breach of the Detention Center Act), award the Trustee damages in any amount to be determined at trial, but no less than $130 million dollars, plus attorneys' fees and costs.

C.  As to Counts III (Breach of the Indenture) and Count IV (Breach of the Mortgage), order the appointment of the above-mentioned receiver to foreclose on and take possession of the Mortgage Collateral, and award the Trustee the attorneys' fees, costs and interest it incurs in enforcing the Bond Documents.

D.  As to Count V (Breach of the USMS Contract), order the Corporation to continue its performance of the USMS Contract.

E.  As to Counts VI (Tortious Interference with Indenture), VII (Tortious Interference with Mortgage), and VIII (Tortious Interference with USMS Contract), award the Trustee damages in any amount to be determined at trial, but no less than $130 million dollars and, consistent with the temporary restraining order request, enjoin the City, the Mayor, and the City Council from further interference with the Indenture, USMS Contract, and Mortgage.

F.  As to Counts IX (Breach of Fiduciary Duty) and X (Aiding and Abetting Breach of Fiduciary Duty), award the Trustee damages in any amount to be determined at trial.

G.  As to Count XI (Declaratory Judgment), declare that the City Council's April 3, 2019 resolutions are null and void and have no effect upon the Corporation or its continued existence.

H.  Award the Trustee such other and further relief as the Court deems just, fair and proper.

Respectfully submitted,

UMB BANK, N.A.,
AS INDENTURE TRUSTEE,

By its counsel,

MINTZ, LEVIN, COHN, FERRIS,
  GLOVSKY AND POPEO, P.C.

  /s/ Adrienne K. Walker
William W. Kannel (pro hac vice pending)
Adrienne K. Walker (pro hac vice pending)
One Financial Center
Boston, Massachusetts 02111
Telephone: (617) 542-6000
E-mail:wkannel@mintz.com
     akwalker@mintz.com

DUFFY & SWEENEY, LTD

  /s/ Robert M. Duffy
Robert M. Duffy (RI Bar # 4428)
1800 Financial Plaza
Providence, Rhode Island 02903
Telephone: (401) 455-0700
E-mail: rduffy@duffysweeney.com

**VERIFICATION**:

UMB Bank, N.A. has knowledge of the facts set forth herein and/or the facts are a matter of
public or judicial record, except where stated upon information and belief, and UMB believes
those facts to be true.

By: Lorna Gleason
Its: Senior Vice President